1

2

3          **UNITED STATES DISTRICT COURT**

4          **NORTHERN DISTRICT OF CALIFORNIA**

5          **SAN JOSE DIVISION**

6

7    CHRISTOPHER MCNATT,                    Case No.  20-4921-BLF  (PR)

8                    Petitioner,
                                            **ORDER DENYING PETITION FOR**
9          v.                               **WRIT OF HABEAS CORPUS;**
                                            **DENYING CERTIFICATE OF**
10   MARTIN GAMBOA, Warden,[1]              **APPEALABILITY; INSTRUCTIONS**
                                            **TO CLERK**
11                   Respondent.

12

13          Petitioner has filed a *pro se* petition for a writ of habeas corpus under 28 U.S.C.

14   § 2254 challenging his 2016 criminal judgment.  Dkt. No. 7 ("Petition").  Respondent filed

15   an answer on the merits.  Dkt. No. 12 ("Answer").  Petitioner did not file a traverse.  For

16   the reasons set forth below, the petition is **DENIED**.

17                              **I.  BACKGROUND**

18          A jury convicted Petitioner of second-degree murder and found that he used a

19   deadly weapon.  Ans., Ex. A at 769*; see also* Cal. Penal Code § 187(a),

20   12022(b)(1).  Petitioner was sentenced to 15 years to life on the murder count, doubled

21   because he had a prior strike, plus a five-year consecutive determinate term for the

22   prior strike, plus a one-year consecutive term for the deadly weapon enhancement, for a

23   total term of 36 years to life.  Ans., Ex. A at 2117–18.  On September 28, 2018, the

24   California Court of Appeal ("state appellate court") affirmed the judgment.  *See* Ans., Ex.

25

26   ─────────────────
     [1] Rosemary Ndoh, the previous warden of Avenal State Prison, where Petitioner is
27   incarcerated, was originally named as the respondent in this action.  Pursuant to Rule 25(d)
     of the Federal Rules of Civil Procedure, Martin Gamboa, the current warden of Avenal
28   State Prison, is hereby SUBSTITUTED as respondent in place of Petitioner's prior
     custodian.

United States District Court
Northern District of California

L, *see also People v. McNatt*, No. A150775, 2018 WL 4659971 (Cal. Ct. App. Sep. 28, 2018) (unpublished).  On September 30, 2018, California Governor Jerry Brown signed a law removing Penal Code section 1385's provision prohibiting judges from striking a prior serious felony conviction enhancement.  *See* Ans., Ex. M at 5.  Petitioner petitioned the state appellate court for rehearing.  *Id.*  The state appellate court granted the petition for rehearing, and on January 14, 2019, issued an opinion affirming Petitioner's conviction but remanding to allow the trial court the opportunity to exercise discretion in striking the five-year enhancement.  *See* Ans., Ex. O, *see also People v. McNatt*, No. A150775, 2019 WL 181223 (Cal. Ct. App. Jan. 14, 2019) (unpublished).  On March 20, 2019, the California Supreme Court summarily denied review.  *See* Ans., Ex. P.  On August 17, 2020, Petitioner filed the instant habeas petition.

## II.  STATEMENT OF FACTS

The following background facts are from the opinion of the state appellate court on direct appeal:

> Around 4:30 p.m. on the afternoon of March 20, 2015, Ron Arrasmith left defendant Christopher McNatt at his trailer in Sonoma, telling him to keep an eye on the place. At some point later that evening, Ron Sauvageau arrived at the trailer looking for Arrasmith, and ended up struggling with McNatt. Shortly after 11:00 p.m., McNatt dumped a large barrel containing Sauvageau's body at Sonoma City Hall. After he drove away, he was pulled over and arrested for being under the influence of methamphetamine.
> . . .
>
> *1. McNatt's Arrest*
> At 11:19 p.m. on March 20, 2015, Sonoma County Deputy Sheriff Alan Collier observed McNatt driving a silver Toyota Tacoma pickup truck near the Acacia Grove Mobile Home Park in Sonoma. McNatt was speeding and driving out of his lane. Deputy Sheriff Collier conducted a traffic stop of the vehicle, and as he approached it, McNatt placed both of his hands out the driver's side window on his own initiative.
>
> After Collier explained his reasons for the stop, McNatt said that he "had to get to his brother's house" to "take care of his brother" "with his knife." McNatt continued that he "needed to put his brother down" and that "there can only be one of us." Collier asked for McNatt's license, and when McNatt fumbled in his pocket for it for an extended period of time, Collier became nervous and ordered McNatt to place his hands on the steering wheel. Collier then observed what appeared to be dried

blood on McNatt's hands.

Collier asked McNatt "a few times" whose blood was on his hands, and McNatt replied that it was "Ron['s]." McNatt went on to say that "Ron was his twin brother," that he was in space No. 2 of the Acacia Grove Mobile Home Park, and that he was in heaven. McNatt was making rapid, repetitive body movements, speaking quickly, and at times sweating profusely. Collier concluded that McNatt was under the influence of methamphetamine, and placed McNatt under arrest for being under the influence of a controlled substance. McNatt asked Collier to remove his handcuffs, and when Collier refused, McNatt said he would "take care" of him and "put [him] down."

Collier began transporting McNatt to the Santa Rosa jail. While en route, he heard a report over the radio that a dead body had been found inside a barrel near Sonoma City Hall. Collier contacted his supervisor and reported that he suspected McNatt might be involved, and was then directed to take McNatt to the Sonoma County Sheriff's Office, where he was placed in an interview room.

### 2. *Body at City Hall*

Meanwhile, around 11:35 p.m., Uber driver Trevor Meeks noticed a 55-gallon plastic barrel covered with tarps near Sonoma City Hall. He called the Sheriff's office and reported that trash had been dumped.

Deputy Sheriff Preston Briggs arrived at the scene at 12:08 a.m. He observed a 55-gallon orange barrel with a blue tarp on top and other miscellaneous items around it, including a green duffel bag, a green couch cushion, and a Skilsaw. There appeared to be dried blood on the side of the barrel. As Briggs approached the barrel, he saw a human hand protruding from inside.

The barrel containing Sauvageau's body was taken to the Sonoma County Coroner's Office. In addition to the body, the barrel contained Sauvageau's passport, a bottle of his prescription medication, two pocket knives, and a cell phone. Sauvageau's eyes were black and blue, and he had several large lacerations on his face and several puncture wounds on his back.

Sauvageau's autopsy found two fractures of the skull, one to back of the head that was the cause of death, and another to the left side of the head inflicted post-mortem. He also had three "chop wounds" inflicted before death, likely by an instrument with a serrated blade, and four post-mortem superficial stab wounds on his back, as well as numerous other minor injuries. Anthony Chapman, who performed the autopsy, opined that the fatal injury to the head was consistent with having been inflicted with a hammer, and that the total of Sauvageau's injuries were consistent with having been inflicted during a "frenzied attack."

### 3. *Arrasmith's Trailer*

Investigators searched Arrasmith's trailer at the Acacia Grove Mobile Home Park beginning around 8:30 a.m. on March 21,

3

2015. They saw what appeared to be blood on the walkway approaching the trailer, on the steps leading up to the trailer, on the path leading around the trailer to a back patio, and about eight feet past the steps toward the back patio. On the back patio, a green cushion was missing from a chair, potted plants had been knocked over, and eyeglasses and a hammer were located on the ground.

Inside the trailer, the kitchen area was in "disarray." On the floor were clothing, towels, and a comforter that appeared to have been used to clean up blood. There was also a green sweatshirt with a distinctive bleach stain and apparent blood on it. The hammer and the sweatshirt were swabbed and tested for DNA. The major contributor of the DNA on the sweatshirt was Arrasmith, the minor contributor was Sauvageau, and McNatt was excluded. The major contributor of the DNA found on the hammer was Arrasmith, and the minor contributor was undetermined, but McNatt and Sauvageau were both excluded.

4. *McNatt's March 21 Interview*

Detective Joseph Horsman interviewed McNatt beginning around 7:30 a.m. on March 21, and a videotape of the interview was played for the jury. McNatt relayed a version of events as follows. He was visiting Arrasmith at his trailer when Arrasmith said he would be back in an hour and left, asking McNatt to keep an eye on his trailer. Around dusk, Sauvageau came by the trailer, asked if Ron was there, and McNatt told him he was not. Sauvageau then went around the trailer to the back patio and sat in a chair. McNatt made various attempts to engage Sauvageau in conversation and to "get some feel for who this person is," but Sauvageau gave him back "nothing." McNatt then grabbed Sauvageau's shoulder and the two "wrestled." McNatt fought with Sauvageau for "almost 20 minutes," and McNatt "felt like it was kind of him or I type thing." With significant prompting from Detective Horsman, McNatt appeared to admit hitting Sauvageau with "objects in the yard" and "once or twice" with a hammer.[2]

[2]For example:

"JH: So let me ask you this, you bring him inside, um, they told me a hammer was found and I don't know the significance of the hammer, um, but a hammer was found. So you bring him inside and you realize, I would imagine that you need to get this guy in the barrel or somewhere?

"CM: Oh, yeah, nothing like that.

"JH: No?

"CM: No. [¶] ... [¶]

"JH: So how many times did you strike him with the hammer do you think before it was finished where you felt safe that he wasn't gonna get you?

"CM: I don't know that.

"JH: More than 10? More than 20?

"CM: No.

"JH: 30?

"CM: I would say no, I, I, ...

4

"JH: 2, 3?
"CM: ... I honestly I don't exactly remember striking him but I know I hit him ...
"JH: Yeah.
"CM: ... uh, with like, he got hit you know, with like objects in the yard you know, like it was in the throes of things ...
"JH: Yeah.
"CM: ... and um ...
"JH: Well I can tell you a hammer was used at one point...
"CM: Alright but ...
"JH: ... just to fill you in because ...
"CM: ... I, if it was, it was not more than once or twice.
"JH: Got it.
"CM: Not 10 or 20.
"JH: Yeah. Yeah.
"CM: You know?
"JH: And I don't know, that's why I'm asking.
"CM: Yeah, I'm just saying it wasn't like, it was nothing brutal like that."

Using a chain, McNatt dragged Sauvageau into the trailer, and eventually loaded his body into a barrel. He then used a dolly to load the barrel onto his truck. McNatt said he "heard you know, a couple kind of familiar voices you know, whether it was you know, my friend Ron and, and a buddy or whatever but they were off in the darkness." McNatt told them he had "to take care of this" and that he would be back. McNatt left the barrel near Sonoma City Hall because "kind of the hall of justice just popped in my mind ... on the four corners of the square" and "it just felt normal to kind of bring it to a place where I know justice was dealt out for ... decades, centuries."

5. *Arrasmith's Statements*
Shortly after 6:00 a.m. on March 21, Detective Jayson Fowler was at Arrasmith's trailer, waiting for a warrant so that he could begin searching the scene, when Arrasmith arrived. Arrasmith told detectives that he did not spend the night at his trailer. Arrasmith was detained, transported to the Sheriff's station, and interviewed.

Arrasmith's interview set forth the following timeline of the evening. McNatt came to his trailer between 12:00 noon and 1:00 p.m., and Arrasmith left at 4:30 p.m., telling McNatt to watch his place for him, and not to let anybody come in of whom he did not approve. From the trailer, Arrasmith went to a friend's house, where he remained until about 8:00 p.m. or 8:30 p.m. He then visited the El Verano Inn for a few minutes, after which he went to another friend's house, where he spent the night.[3]

[3]A surveillance camera at the El Verano Inn captured Arrasmith entering and leaving between 7:30 and 7:32 p.m. Arrasmith was wearing a green sweatshirt with a bleach stain on

the front.

In the morning, he returned to his trailer, where he ran into the police. Arrasmith also said that he knew Sauvageau well, and that Sauvageau visited often and occasionally spent the night.

On March 24, detectives again visited Arrasmith's trailer, looking for the dolly. Arrasmith again arrived at the scene and was again brought to the Sheriff's station for an interview. He initially stated that the dolly was his, but then said that he had borrowed it from a neighbor on the night of March 19. He "recapped" his initial statements regarding his whereabouts the night of the murder, saying "very clearly" that he left his trailer around 4:30 p.m. and did not return until the following morning.

On April 3, Detective Horsman spoke to Arrasmith over the phone and articulated his theory that Arrasmith did not participate in the murder, but helped McNatt dispose of the body. Arrasmith agreed to meet with Horsman that same day at a McDonald's, where Horsman showed Arrasmith a photo from the El Verano Inn surveillance camera of the green sweatshirt he was wearing the night of the murder and noted it was found the following morning in his trailer. Arrasmith did not want to discuss the matter at that time.

On April 16, Arrasmith was again interviewed by Horsman. For the first time, he admitted returning to his trailer the night of the murder, stating that he "did show up, but I'd open the door and I saw some legs and I go what in the fuck's goin' on, and, eh, and then Chris, he, he was acting kinda weird, so I just slammed the fuckin' door!" He assumed that Sauvageau was "passed out" and denied having helped McNatt dispose of the body. Arrasmith admitted that he "must've changed" such that his sweatshirt ended up on the floor of the trailer, but said he did not "remember that part."

On May 13, Arrasmith was charged with accessory after the fact (Pen. Code, § 32).

On December 30, as part of a plea negotiation, Arrasmith was again interviewed at the Sheriff's station.[4]

> [4]As will be discussed in further detail below, the defense did not learn of this interview until Horsman testified at trial.

Arrasmith again told detectives that he left McNatt at his trailer around 4:30 p.m. In addition to the El Verano Inn, Arrasmith for the first time stated that he visited "Agua Caliente" that evening looking for drugs.[5]

> [5]In particular, Arrasmith stated: "Uh, but I-, that-, that's why I run around. I go by their house or anything. They're not home, so I'll go to my next one. And there's distance between. Sonoma, El Verano, you know? Agua Caliente. Anyway,

so after that I just kept going around and then I guess it getting late, I thought it was around nine-thirty, I'm heading for Cookie's and I know I'll get high there."

He also again stated that he had returned to his trailer on the evening of March 20 around 9:30 p.m. or 10:00 p.m., telling detectives that he found "somebody passed out" and that McNatt was smiling and watching a video. Arrasmith denied seeing any blood, and stated that he left immediately after changing his sweatshirt, went to a friend's house, and got high. He denied having anything to do with the murder or with loading Sauvageau's body into a barrel or into McNatt's truck.

### 6. *McNatt's Trial*

On October 14, 2015, the Sonoma County District Attorney charged McNatt with the murder of Ronald Sauvageau (Pen. Code, § 187, subd. (a) ). The information further alleged that McNatt had used a deadly weapon (a hammer) in the commission of the offense (Pen. Code, § 12022, subd. (b)(1)), and that he had a previous conviction for burglary that was both a "strike" and a "serious felony." (Pen. Code, § 667, subds. (a)-(j).)

McNatt's trial took place in February of 2016. The prosecution's theory of the case was that Sauvageau arrived at Arrasmith's trailer while Arrasmith was not there, that McNatt struggled with him in the yard and ultimately killed him with a hammer, and that Arrasmith then helped McNatt dispose of the body after returning home and finding Sauvageau dead. The defense theory was that McNatt struggled with Sauvageau in the yard until Sauvageau was rendered unconscious and then dragged him into the trailer, but that it was Arrasmith who later committed the murder while McNatt drove to McDonald's, and that Arrasmith had then helped McNatt dispose of the body.[6]

> [6]Alternatively, defense counsel argued that McNatt had killed Sauvageau in reasonable or unreasonable self-defense.

McNatt testified in his own defense, telling the jury that he had wrestled with Sauvageau in the backyard, that they had each other in "simultaneous headlocks," and that at some point Sauvageau had stopped moving, but he denied hitting Sauvageau with any objects or causing any bleeding. He then carried Sauvageau into the trailer. Arrasmith had returned home, and sent McNatt to McDonald's, where he was captured on video between 10:05 p.m. and 10:12 p.m. When McNatt returned, there was blood all over the floor and Sauvageau had a jacket pulled over his face and head. McNatt then loaded the body into a barrel and onto his truck. Arrasmith told McNatt to leave the body "on some long road towards Napa," but instead he left it at Sonoma City Hall.

The defense subpoenaed Arrasmith as a witness, but he invoked his Fifth Amendment right to refuse to testify.

7

1

2

> On March 1, 2016, the jury found McNatt guilty of second
> degree murder and found true the allegation that he had used a
> deadly weapon in the commission of the offense.[7]

3

4

>> [7]After McNatt was found guilty, Arrasmith
>> entered a plea of no contest to the charge of
>> accessory after the fact.

5

*McNatt*, 2019 WL 181223 at *1-4.

6

## III. DISCUSSION

7

### A.  <u>Legal Standard</u>

8

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),

9

a federal court may entertain a petition for writ of habeas corpus "in behalf of a person in

10

custody pursuant to the judgment of a State court only on the ground that he is in custody

11

in violation of the Constitution or laws or treaties of the United States."  28 U.S.C.

12

§ 2254(a).  The petition may not be granted with respect to any claim adjudicated on the

13

merits in state court unless the state court's adjudication of the claim: "(1) resulted in a

14

decision that was contrary to, or involved an unreasonable application of, clearly

15

established Federal law, as determined by the Supreme Court of the United States; or (2)

16

resulted in a decision that was based on an unreasonable determination of the facts in light

17

of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

18

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state

19

court arrives at a conclusion opposite to that reached by [the United States Supreme] Court

20

on a question of law or if the state court decides a case differently than [the] Court has on a

21

set of materially indistinguishable facts."  *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–

22

13 (2000).  "Under the 'unreasonable application' clause, a federal habeas court may grant

23

the writ if the state court identifies the correct governing legal principle from [the] Court's

24

decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id*. at

25

413.  "[A] federal habeas court may not issue the writ simply because that court concludes

26

in its independent judgment that the relevant state-court decision applied clearly

27

established federal law erroneously or incorrectly.  Rather, that application must also be

28

unreasonable."  *Id.* at 411.  A federal habeas court making the "unreasonable application"

United States District Court
Northern District of California

8

1 | inquiry should ask whether the state court's application of clearly established federal law

2 | was "objectively unreasonable." *Id*. at 409.

3 | The state court decision to which Section 2254(d) applies is the "last reasoned

4 | decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991).[2] In

5 | reviewing each claim, the court must examine the last reasoned state court decision that

6 | addressed the claim. *Cannedy v. Adams*, 706 F.3d 1148, 1158 (9th Cir.), *amended*, 733

7 | F.3d 794 (9th Cir. 2013).

8 | **B.**   **Claims and Analyses**

9 | Petitioner raises the following two claims in this federal habeas petition:

10 | (1)   the prosecutor's late disclosure during trial of Arrasmith's December 30

11 | statement violated Petitioner's right to due process under *Brady v. Maryland*, 373 U.S. 83

12 | (1963); and

13 | (2)   Petitioner's attorney provided ineffective assistance of counsel related to

14 | DNA evidence.

15 | **1.**   ***Brady v. Maryland***

16 | Petitioner asserts "there is a video tape the acting DA . . . was in personaly [sic]

17 | accusing Ronald Arasmith of the murder. They hid it from us after all discovery was in not

18 | even Judge or Jury new [sic] of it." Pet. at 5.  During Arrasmith's December 30 interview,

19 | after Arrasmith had refused to take a lie detector test, the detective said he would "go get

20 | [the prosecutor]," after which the prosecutor came into the room and stated:

> I just wanna tell you, my bosses and I are talking about whether we should charge Mr. Arrasmith with the murder of McNatt. We're hoping that today's proffered statement is just gonna shed truth, in terms of what Mr. Arrasmith saw. I'm- I'm kinda disappointed that the proffered interview isn't going as we had hoped and I-, I really hope that we can give a thorough, truthful statement today.

25 | Ans., Ex. A at 2409.

---

[2] Although *Ylst* was a procedural default case, the "look through" rule announced there has been extended beyond the context of procedural default. *Barker v. Fleming*, 423 F.3d 1085, 1091 n.3 (9th Cir. 2005).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Petitioner raised this *Brady* claim about the late disclosure of the December 30

2    interview on direct appeal, arguing that the prosecutor willfully withheld the statement—

3    which could have exonerated Petitioner entirely or corroborated his first statement to the

4    police on March 21, or bolstered the defense theory that Arrasmith was the one who killed

5    Sauvageau—until two weeks into trial, in violation of Petitioner's Fourteenth Amendment

6    right to due process and Sixth Amendment right to counsel.  Ans., Exhibit K at 66.

7    Petitioner raised the claim again to the Supreme Court of California, suggesting that had

8    counsel received the video interview sooner, she would have pursued different

9    investigation, defenses, or trial strategies, such as that Petitioner was only an accessory to

10   the murder.  Ans., Exhibit P at 37.

11   The existence of the December 30 interview came to light during cross-examination

12   of Detective Horsman at trial on February 16, 2016.  Ans., Ex. C at 3997.  The detective

13   asserted privilege when asked a question about the last time he interviewed Arrasmith.  *Id.*

14   The prosecutor asked for an in-camera hearing, and the judge cleared the courtroom except

15   for the prosecution team.  *Id.* at 4000.  The prosecutor informed the judge that the

16   December 30 interview was a proffer interview in which Arrasmith and his counsel agreed

17   that the information provided would be confidential unless it contained *Brady* material.  *Id.*

18   at 4002.  The prosecutor stated that the interview did not contain any *Brady* material, the

19   proffer was "not successful," and he decided not to call Arrasmith as a witness, and

20   therefore he believed the interview remained appropriately confidential and disclosure to

21   the defense was not required.  *Id.* at 4002-03.  The judge was "astounded," and ordered

22   immediate production of the tape and transcript, *id.* at 4005-05, but agreed to hear the

23   matter further the next morning at the prosecution's request.  *Id.* at 4007.

24   The court expressed concerns again the next day about the prosecution's failure to

25   disclose the interview, noting that Arrasmith was a "central, key witness," and that the

26   defense theory was that he had committed the murder.  Ans., Ex. C at 4059.  The court also

27   noted that the prosecution's "unilateral decision" not to provide the interview violated the

28   court's order to produce all discovery before trial, and that California Evidence Code 1040,

10

1   which the prosecution claimed justified withholding of the interview, did not apply.  *Id.* at

2   4058-60.  The prosecution called the interview "cumulative with respect to . . . discovery."

3   *Id.* at 4061.  The court reviewed the video of the interview, found it to be material, *id*. at

4   4064, and ordered disclosure to the defense.  *Id.* at 4067.

5          The defense moved to dismiss the case for *Brady* violations the next day.  Ans., Ex.

6   C at 4254.  The court denied the motion, finding that there was no *Brady* violation because

7   "there was no material in this interview that exonerated [Petitioner] from the homicide."

8   *Id.* at 4458-59 (Dkt. No. 14).  On the other hand, the court did find that the interview

9   contained impeaching material, and violated its discovery orders.  *Id.* at 4457, 4460.  The

10  court therefore considered giving a jury instruction on late discovery.  *Id.* at 4462.  As a

11  "curative" measure, the court allowed the defense to play the video, absent any references

12  to the separate criminal proceeding against Arrasmith and absent the portion where the

13  prosecutor discussed charging Arrasmith with the murder.  *Id.* at 4749, 4752-53.  The court

14  ultimately denied the late discovery instruction with respect to the video.  *Id.* at 5307.

15         Petitioner's trial attorney also moved for a new trial, in part because of the failure to

16  timely disclose the interview and video.  Ans., Ex. C at 6101-02.  The trial court, while

17  noting the "history in this case of the People providing either late or incomplete discovery

18  to the Defense," and reiterating that the December 30 interview "was absolutely

19  discoverable and should have been discovered before this trial," denied the motion for a

20  new trial because the misconduct did not rise "to the level that it would allow for a new

21  trial."  *Id.* at 6102-03.  In addition, the court noted that it had "cured any error" by allowing

22  the defense to play portions of the video.  *Id.* at 6105.

23         Petitioner argued on appeal that Arrasmith's December 30 interview contained the

24  following "critical new evidence": Arrasmith stated that he and Petitioner, rather than he

25  and another person as he had previously stated, had swapped jewelry several days before

26  the murder; he stated for the first time that he went to Agua Caliente the night of the

27  murder; he admitted for the first time that he was using drugs and high the night of the

28  murder; he stated it was around 9:30 p.m. when he left his trailer after seeing someone

United States District Court
Northern District of California

passed out on the floor, and did not see any blood; the detective asked him for the first

time about another witness's claim that Arrasmith had previously fought with the victim;

and he stated for the first time that he did not see the barrel in the trailer when he saw the

person passed out on the floor.  *See* Ans., Ex. K at 77-80.  Petitioner argued that defense

counsel's inability to incorporate these statements into the theory of the defense and into

cross-examination of prosecution witnesses prejudiced him.  *Id.* at 80.

The state appellate court denied the *Brady* claim:

> Much of McNatt's briefing is devoted to arguing that the
> December 30 statement was material, that it impeached
> Arrasmith's credibility, that it tended to support the defense
> theory of the case (i.e., that Arrasmith had himself committed
> the murder and that McNatt was at most an accessory after the
> fact), and that it should have been timely disclosed. But as
> discussed above, the December 30 statement *was* disclosed at
> trial and presented to the jury during the defense's case. The
> question is therefore not whether the statement was material, but
> "'whether defense counsel was "prevented by the delay from
> using the disclosed material effectively in preparing and
> presenting the defendant's case."'" . . . We agree with the trial
> court that defense counsel was not.
>
> Certainly the information in the December 30 statement did not
> change the primary defense theory of the case, which was that
> Arrasmith had committed the murder while McNatt was at
> McDonald's shortly after 10:00 p.m. Defense counsel so
> represented in her opening statement, telling the jury that when
> McNatt returned from McDonald's "things are different" and
> that Sauvageau "is still there, but there is a very large pool of
> blood on the floor of the trailer where [he] is that was not there
> before." McNatt testified in his own defense to the same effect.
> Again in her closing argument, defense counsel presented this
> theory of the case to the jury, this time making repeated
> reference to the December 30 statement. Indeed, McNatt's reply
> brief concedes that even "*[b]efore* trial the defense made clear
> its theory that Arrasmith killed Sauvageau." (Italics added.)
> Although McNatt asserts that the late disclosure of the
> December 30 statement affected defense counsel's "preparing [
> ...] Opening Statement or her planned cross-examination of
> prosecution witnesses," he does not explain how.
>
> With respect to how the late disclosure may have prejudiced
> defense counsel's investigation of the case, McNatt points only
> to the portion of the December 30 statement where Arrasmith
> for the first time claimed he visited "Agua Caliente" looking
> for drugs on the night of the murder. McNatt notes that Arrasmith
> drove a distinctive three-wheeled bicycle and argues that
> "looking at cameras in the Agua Caliente neighborhood would
> have been crucial to confirming or disputing his new timeline,

1

2

3

4

5

6

7

> which went to his credibility." But as the Attorney General notes, Arrasmith did not provide any specific location or timeframe in the Agua Caliente neighborhood that could have been searched for video cameras. McNatt also does not explain why any such investigation could not have been conducted in between the time the December 30 statement was disclosed to the defense on February 17 and when the defense rested its case on February 25. Nor did defense counsel request a continuance in order to investigate the new information regarding Agua Caliente, or any other new information in the December 30 statement. . . . In sum, McNatt has failed to demonstrate that the delay in disclosure of the December 30 statement prevented him from effectively using that statement in preparing and presenting his case.

8

*McNatt*, 2019 WL 181223 at *8 (citations omitted).

9

10

11

12

13

14

15

16

17

18

19

     The state appellate court's conclusion was not unreasonable.  "[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment."  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  For a *Brady* claim to succeed, Petitioner must show: (1) that the evidence at issue is favorable to the accused, either because it is exculpatory or impeaching; (2) that it was suppressed by the prosecution, either willfully or inadvertently; and (3) that it was material (or, put differently, that prejudice ensued).  *Banks v. Dretke*, 540 U.S. 668, 691 (2004).  *Brady* does not, however, necessarily require that favorable material evidence be disclosed before trial.  *See*, *e.g.*, *United States v. Aichele*, 941 F.2d 761, 764 (9th Cir. 1991).  "[T]he relevant inquiry is whether the disclosure, when made, was still of value to the accused."  *United States v. Purry*, 702 F. App'x 511, 514 (9th Cir. 2017).

20

21

22

23

24

25

26

27

28

     Here, the trial court and state appellate court both reasonably found that Petitioner was not prejudiced by the late disclosure.  The late disclosure of Arrasmith's December 30 statements does not "undermine confidence" in the verdict.  *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).  As the state appellate court pointed out, defense counsel had already long pursued, investigated, and suggested to the jury the theory that Arrasmith had committed the murder and Petitioner had only helped him clean it up afterward.  *McNatt*, 2019 WL 181223 at *8, *see also* Ans., Ex. J at 28 (defense counsel's opening statement suggesting that Petitioner came back from McDonald's to find Savageau dead with new injuries that Petitioner did not cause and his blood everywhere).  Petitioner received the benefit of the

United States District Court
Northern District of California

impeaching material in the statement through playing it for the jury, including that Arrasmith was high the night of the murder and that he may have previously been in a fight with the victim.  As the state appellate court pointed out, to the extent an investigation into Arrasmith's visit to Agua Caliente would have been helpful, the defense had the opportunity to investigate or seek a continuance.  Petitioner has not identified, on appeal or in this petition, any additional investigation or theories that could have been undertaken based on Arrasmith's December 30 statements that were impossible by the time of disclosure.

Further, even if the prejudice prong were met for purposes of establishing a *Brady* violation, the error was harmless by AEDPA standards because it would not have had a "substantial and injurious effect or influence" on the verdict.  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  The jury would likely have convicted Petitioner based on his statements to the police on March 20 and March 21, as well as his trial testimony, even if the Arrasmith interview had been disclosed earlier.  On March 20, Petitioner told the deputy sheriff who pulled him over that "he 'needed to put his brother down' and that 'there can only be one of us.'"  *McNatt*, 2019 WL 181223 at *1.  On March 21, he told the police that he fought with Savageau for 20 minutes, that he "felt like it was kind of him or I type thing," and that he hit Savageau with objects in the yard and a hammer.  *Id.* at *2.  During cross-examination at trial, Petitioner testified that after they fought, Savageau lay face down without moving for what might have been ten minutes or longer, and that he could not remember whether Savageau had any injuries or whether there was any blood at that time.  Ans., Ex. C at 4505-06.  He testified that for the period of time between their fight and when Arrasmith came back, Savageau still did not move and Petitioner thought he could be "very hurt" but he did not try to get help.  *Id.* at 4515.  Further, the prosecutor impeached Petitioner at trial with statements from his March 21 interview that Petitioner grabbed Savageau because he was ignoring him, that Arrasmith had not actually told Petitioner not to let anyone onto the property, and that the fight with Savageau was the culmination of years of anger towards Petitioner's mother.  *Id.* at 4535-37; 4567-72.  There

14

1   was significant evidence against Petitioner.  Because the state appellate court's rejection of

2   this claim was neither an unreasonable application of Supreme Court precedent, nor an

3   unreasonable determination of the facts, Petitioner is DENIED relief on claim one.

4       **2.  Ineffective Assistance of Counsel**

5       Petitioner describes his second claims as:

6           DNA evidence, I was excluded from all DNA but the victim and
            Ronald Arasmith was on all evidence . . . sweat shirt, knife,
7           hammer, and the DA said Ronald washed all my DNA off these
            items, but somehow left his and victims blood, DNA on all
8           items. My attorney didn't push for this its impossible to do.

9   Pet at 5.[3]  This Court previously construed this claim as one of ineffective assistance of

10  counsel.  Dkt. No. 10 at 2.  Petitioner did not raise ineffective assistance of counsel claims

11  on direct appeal or his petition for review to the California Supreme Court.  Without

12  addressing respondent's contention that this claim is unexhausted, it fails on the merits.

13  *See* 28 U.S.C. § 2254(b)(2); *Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005) ("a

14  federal court may deny an unexhausted petition on the merits . . . when it is perfectly clear

15  that the applicant does not raise even a colorable federal claim.").

16      The benchmark for judging any claim of ineffectiveness is whether counsel's

17  conduct so undermined the proper functioning of the adversarial process that the trial

18  cannot be relied upon as having produced a just result.  *Strickland v. Washington*, 466 U.S.

19  668, 686 (1984).  In order to prevail, Petitioner must establish two things.  First, he must

20  establish that counsel's performance was deficient, i.e., that it fell below an "objective

21  standard of reasonableness" under prevailing professional norms.  *Id.* at 687-88, *see also*

22  *Andrus v. Texas*, 140 S. Ct. 1875, 1881 (U.S. June 15, 2020) (per curiam).  Second, he

23  must establish that he was prejudiced by counsel's deficient performance, i.e., that "there

24  is a reasonable probability that, but for counsel's unprofessional errors, the result of the

25  proceeding would have been different."  *Strickland*, 466 U.S. at 694; *Andrus*, 140 S Ct. at

26  1881.  A reasonable probability is a probability sufficient to undermine confidence in the

27

28  [3] Petitioner also states, "I asked for a attorney but because the way I said it the judge said
    says attorney not good enough?"  Pet. at 5.

1    outcome.  *Id.*

2         Here, Petitioner's trial counsel diligently requested the prosecution's DNA

3    evidence, even motioning for sanctions based in part on the late testing and disclosure of

4    some swabs taken from a milk can and the concrete breezeway outside of Arrasmith's

5    trailer.  *See* Ans., Ex. C at 3853, 3862-63.  When the prosecution sent the two swabs out

6    for testing during trial after the cross-examination of one of the detectives who

7    investigated the case, defense counsel requested a continuance in order "to consult with

8    experts about whether there are any anomalies in the DNA result and to reconcile the

9    anomalous result that the human species test doesn't come up positive for blood, but the

10   presumptive test does, and that the DNA test gives a result."  *Id.* at 3856, 3859.  The court

11   provided defense counsel time during lunch to contact experts, and counsel received the

12   "new information" she needed.  *Id.* at 3864, 4114.

13        Furthermore, defense counsel cross-examined the DNA expert extensively

14   regarding all of the DNA evidence.  Ans., Ex. C at 4176-4200, 4204-06.  During closing,

15   counsel argued to the jury several times that the absence of Petitioner's DNA on the

16   hammer and the double-edged knife found at the trailer indicate that Petitioner did not

17   inflict the wounds that caused Savageau's death, and that Arrasmith's DNA on those items

18   points to Arrasmith's guilt and untruthfulness.  *Id.* at 5569, 5574, 5576, 5577, 5584, 5602,

19   5604.  It is clear that counsel's performance was not deficient with respect to exploring the

20   DNA evidence and arguing to the jury that it demonstrated Petitioner's innocence.  Even if

21   counsel's performance were deficient in investigating or emphasizing the nature of the

22   available DNA evidence in the case, the prejudice prong is not met.  Petitioner's

23   incriminating statements make it highly unlikely that the result of the proceeding would

24   have been different absent the error.  *See supra* at 13-14.  Petitioner's second claim is

25   therefore DENIED on the merits.

26                              **IV.  CONCLUSION**

27        After a careful review of the record and pertinent law, the Court concludes that the

28   Petition must be **DENIED**.

16

Further, a Certificate of Appealability is **DENIED**.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.  Petitioner has not made "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

The Clerk shall enter judgment in favor of Respondent and close the file.

Additionally, the clerk is directed to substitute Martin Gamboa on the docket as the respondent in this action.  *See supra* at 1, fn. 1.

**IT IS SO ORDERED**.

Dated: __September 1, 2021_____

BETH LABSON FREEMAN
United States District Judge